

**SO ORDERED.**

**SIGNED this 05 day of June, 2009.**

*Dale L. Somers*
**Dale L. Somers**
**UNITED STATES BANKRUPTCY JUDGE**

_____

**Designated for print publication and on-line use**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

In re:

**GATEWAY ETHANOL, L.L.C.,**

               **DEBTOR.**

**CASE NO. 08-22579**
**CHAPTER 11**

**MEMORANDUM OPINION AND ORDER FINDING**
**DEBTOR'S AGREEMENT WITH INDECK POWER EQUIPMENT IS A TRUE LEASE**

The question under advisement is whether Gateway Ethanol's ("Gateway" or "Debtor")

agreement with Indeck Power Equipment Company ("IPE"or "Indeck Power") with respect to

Gateway's acquisition of a thermal oxidizer boiler system from IPE is a true lease or a

sale/security agreement. The issue arose in Dougherty Funding L.L.C.'s ("Dougherty")

response[1] to the Objection of Indeck Power Equipment Company to the Cure Amount and

Statement of Cure Claim under Debtor's Notice of Intent to Assume and Assign Certain

_____
[1] Doc. 227.

Executory Contracts and Unexpired Leases in Conjunction with the Sale of Assets.[2]  Whether the agreement is a true lease was severed from other related issues, such as the cure amount if the agreement is a lease, and an evidentiary hearing held.  IPE appeared by Michael D. Freeborn, Thomas R. Fawkes, and Kellye L. Fabian of Freeborn and Peters, LLC, Chicago, Illinois.  Dougherty appeared by Paul L. Ratelle and Jeffrey W. Jones of Fabyanske, Westra, Hart & Thomson, P.A., Minneapolis, Minnesota.  Debtor appeared by Laurence M. Frazen of Bryan Cave LLP, Kansas City, Missouri.  There were no other appearances.  The Court has jurisdiction.[3]

## BACKGROUND.

Debtor Gateway Ethanol, LLC is the owner operator of an ethanol plant in Pratt, Kansas.  Lurgi PSI, Inc. ("Lurgi") entered into a contract with Debtor to design and construct a fully integrated dry-mill plant capable of processing approximately 20 million bushels of local corn and milo to produce approximately 50 million gallons of fuel grade ethanol, and related by-products, per year.  Dougherty was retained to obtain an approximately $53 million construction loan.  In September 26, 2006, Gateway and IPE entered into an agreement denoted as a lease, whereby Gateway was to be supplied a thermal oxidizing boiler system ("Equipment")[4] for use

---

[2] Doc. 194.

[3] This Court has jurisdiction pursuant to 28 U.S.C. § 157(a) and §§ 1334(a) and (b) and the Standing Order of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's Bankruptcy judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective July 10, 1984.  The determination of whether the Debtor acquired property in a sale or in a lease, which is subject to assumption or rejection, and the related question of what interest in such property was transferred in a sale under 11 U.S.C. § 365 are core proceedings which this Court may hear and determine as provided in 28 U.S.C. § 157(b)(2)(A).  There is no objection to venue or jurisdiction over the parties.

[4] The Equipment which is the subject of the Agreement includes the TO/Boiler (the gas fired boiler, economizer, fan, burner, and control panel) and related equipment, such as piping, structural steel, and a

2

in the plant (hereafter "Agreement"). It is this Agreement which is the subject of this controversy. When Gateway filed for relief under Chapter 11 on October 5, 2008, the plant had never produced ethanol to the design standards, ethanol was not being produced, and most of the payments required under the Agreement with IPE were in default.

On October 24, 2008, Debtor filed its motion to sell all of its right, title, and interest in substantially all assets owned by Debtor, including the ethanol plant. In conjunction with the sale, on November 4, 2008, Debtor served an Assumption and Assignment Notice, listing the IPE Agreement as one of the unexpired leases and executory contracts that Debtor intended to assume and assign to the purchaser of its asset, but listed the cure amount as "Undetermined."[5] On December 8, 2008, IPE objected to the characterization of the cure claim.[6] Dougherty, the stalking horse and the only bidder, offered to purchase the assets by credit bid of approximately $60 million dollars.[7] The sale was approved by order entered on January 5, 2009, but the objections of IPE and other creditors were preserved.[8] Thereafter, on January 13, 2009, Dougherty filed its response to IPE's objection, raising for the first time the contention that the Agreement is not a true lease.[9]

IPE opposes the recharacterization of the Agreement as a sale and security agreement, as this distinction has major financial implications. If the Agreement is a true lease, before

---

stack.

[5] Doc. 148.

[6] Doc. 194.

[7] Doc. 103.

[8] Doc. 221

[9] Doc. 227

3

Dougherty, the purchaser, may keep the Equipment provided by IPE, the lease must be assumed and assigned to Dougherty, with Dougherty being liable for future lease payments and the cure amount owed to IPE as an administrative expense. On the other hand, if the transaction was a sale, Gateway was the prepetition owner of the Equipment and sold the system to Dougherty, together with all other assets in the § 363 sale. Because IPE did not file a UCC-1 with respect to the boiler system, it would have an unsecured claim for the amount owed under the Agreement, which claim would probably receive no or very little payment.

**FINDINGS OF FACT.**

   Indeck Power Equipment (IPE) was founded in 1960 or 1961. It is an equipment company which builds packaged steam generating equipment for sale and lease. Indeck Power has the largest stock of used and new boilers, and related equipment, in the world and is the largest supplier of rental boilers in the United States. A related company, Indeck Energy Company, is involved in cogeneration of power; it develops projects from the ground up on an own and operate basis. It invests in power plants, including ethanol plants. Both these entities had relationships with Gateway. Indeck Power entered into the Agreement to supply the Equipment, which includes the thermal oxidizer boiler ("TO/Boiler"), to Gateway. Indeck Energy invested in Gateway and also was a party to an Energy Services Agreement with Gateway. The evidence clearly establishes that Indeck Power and Indeck Energy acted independently, that the individuals involved with Gateway and/or Dougherty on behalf of Indeck Power and Indeck Energy acted only on behalf of their respective employers, and that Indeck Power's investment in Gateway was not a factor influencing the Agreement in any way.

4

Dougherty, which had been hired by Gateway as the investment advisor for the project, began in the fall of 2004 to put together funding for the Gateway Ethanol plant to be built in Pratt, Kansas. In the fall of 2005, Gateway was planning to utilize a gas fired thermal oxidizer boiler in the plant to be supplied by IPE. At a meeting in Kansas City, the vice president of development for Indeck Energy met with a representative of Gateway and proposed the use of a coal powered boiler system under development by Indeck Energy. It was quickly realized that implementing a coal-fired system would likely delay the ethanol plant, and the plan to use a gas fired system to be supplied by IPE was reinstated. However, before the end of 2005, Gateway and Indeck Energy entered into an Energy Services Agreement which gave Indeck Energy the right to build, own, and operate the energy plant at the Gateway project using a coal-fired boiler. After that, Indeck Energy was involved in the Gateway design to be sure that the lay out for the gas fired boiler system, the TO/Boiler and related equipment, would not interfere with a later installation of a coal-fired system. Also, by the fall of 2005, Indeck Energy had committed to investing in the Gateway project, although that commitment was not finalized until some later date.

On November 29, 2005, a meeting was held to go over the project. It was attended by representatives of Gateway, Dougherty, and Gateway investors, including Indeck Energy. At that time, the projected costs of construction had increased significantly and some investors had withdrawn, so the project was about two and half or three million dollars short. This increased the ratio of equity to debt above the 45/55 level which Dougherty advised was required to attract investors. The project could not go forward as planned without a solution to the problem. A suggestion was made that the TO/Boiler be leased, rather than purchased from IPE. This

5

proposal reduced the construction costs funding by eliminating the boiler acquisition costs from the Lurgi construction budget, but increased Gateway's projected operating expenses by the amount of the lease payments. IPE was consulted, and an agreement, entitled Equipment Lease, dated December 15, 2005, was executed by IPE and Gateway.

The December 15 agreement provides for the lease of one IPE TO/Boiler system for a term of 60 months. The agreement states the replacement value, which the Court finds is essentially the purchase cost of the equipment on the date of the transaction, is $3,600,000 and the payments shall be $64,590.00 per month for 60 months. The scheduled shipping date was to be determined.

Dougherty prepared an Information Memorandum dated December 2005 to be distributed to potential lenders for the $53,150,000 construction/term loan for the Gateway Ethanol project. The pro forma income statement for Gateway in the memorandum includes lease expense in the amount of $64,590 per month. The fee to Dougherty for the successful closing of the transaction was about $900,000. It also was entitled to service fees of .25 per cent.

After the December agreement was executed, Lurgi made changes to the plant design to increase the output, which required changes in the boiler system. A new agreement, dated September 26, 2006 (hereafter the "Agreement"), was executed, which incorporated a new proposal from IPE which included the changes in the system. The September Agreement provides the replacement value is $5,041,970.00, the payments are $93,474.85 per month for 60 months, and shipment shall be as early as possible in February, 2007. Gateway provided IPE

6

with a Kansas sales tax exemption certificate,[10] exempting the transaction from the Kansas Retailers' sales and compensating tax.[11]

The material terms and conditions of the Agreement include the following. IPE is identified as the Lessor and Gateway Ethanol as the Lessee. Typewritten in the Description of Equipment Leased box is the following:

> The equipment shall ship F.O.B. shipping point and returned with dismantling and freight charges to and from the job site to be paid by Lessee.
> Lessee shall have the option to purchase the equipment for a non-bargain price at $600,000.00 at the end of the minimum lease term (five (5) years).

IPE is responsible for transportation and installation of the Equipment. The Agreement states it is "non-cancellable by the Lessee for the Rental Term." It provides that the equipment is property of the Lessor and shall remain so, even if attached to real property; that Lessee shall at its own expense maintain the equipment; that Lessee shall pay all license fees and taxes; that Lessee assumes all risk of loss; that Lessee shall maintain physical loss insurance naming Lessor as the primary loss payee; and that the Agreement shall be governed by the laws of the State of Illinois. At the request of Gateway, as IPE had done in other lease transactions, the warranties are those which IPE customarily provides in sales transactions.[12] As to Gateway's duties at the end of the term, the Agreement provides:

> Lessee at its expense shall return the Equipment in the same condition as when received ordinary wear and tear excepted, to

---

[10] Exh. MM.

[11] The Court notes that pursuant to K.S.A. 79-3603(a) and (h) the tax applies to both the sale and rental of personal property.

[12] Exh. 6, p. 00021.

7

Lessor's Office above on the ending date of this Lease or sooner upon demand by Lessor (or permit Lessor to remove said Equipment if Lessor is to provide transportation).[13]

In the event of any default by Lessee of any term or obligation of his Lease, Lessor may, without limitation, terminate this Lease. Upon such termination, Lessee shall immediately deliver, at its own cost and expense, the leased Equipment to Lessor at Lessor's Office, or shall, at Lessor's option and without further notice, permit Lessor to enter the premises where the leased Equipment is located and permit Lessor to obtain possession of and remove the same, including disconnection and separation of the leased Equipment from any other property . . ..[14]

The President of IPE was solely responsible for determining the economic terms of the Agreement. When deciding these terms, she considered the 5 year term of the Agreement; the stock of boilers which IPE had available; the budget for assembly of the system; what IPE could do with the system if it was returned at the end of the five year term; the estimated cost to return the system after five years; the risk posed by the contractor, Lurgi; and IPE's desired return on its investment. Several factors resulted in significant changes in the economic terms between the December 2005 and September 2006 agreements. In 2005, Lurgi was using a third party licensed design for the plant, with which IPE was familiar, but in 2006 Lurgi changed to its own design. The Lurgi design required a higher capacity boiler. It also required IPE to incur additional design and engineering costs and to assume increased risk because, if the design was not successful, the IPE Equipment might be blamed for Lurgi design failures. The replacement value, which is essentially the initial value of the equipment, increased from $3,600,000 to $5,041,970; the

---

[13]Exh. 5, ¶ 3.

[14]Exh. 5, ¶ 16.

monthly payments increased from $64,590 to $93,474.85, and the non-bargain price for the system at the end of five years (the estimated value of the TO/Boiler at the end of five years) changed from $586,500 to $600,000. The absence of a linear relationship between the changes in the replacement value and the non-bargain price was because the majority of the increased cost for the modified system was for engineering and design services and for supplying equipment external to the boiler itself. The external equipment was estimated to have little value at the end of five years. A computer program, which computes monthly payments and amortization based upon selected principal amount, interest rate, number of payments, and balloon amount, was used when determining the economic terms, but an amortization schedule was not maintained in the Gateway file at IPE or provided to Gateway. One print out shows that assuming 60 monthly payments of $93,474.85 and a discount rate of 7.754%, the total principal payment would be $4,445,822.39 and that approximately $600,000 of the $5,041,970 would be outstanding.[15]

When determining the economic terms, IPE estimated that the cost to return the TO/Boiler (but not much of the external equipment)[16] from Pratt to IPE at the end of five years would be $200,000 to $250,000. This estimate, which includes transportation costs, was based upon adjustments to the costs incurred when IPE a few years earlier had removed two larger steam boiler systems, one from a Ford Motor plant and one from the GM River Rouge facility. The adjustments to those charges were fully explained, and Dougherty was unsuccessful in impeaching IPE's witness in this regard. The IPE system is modular so that the items which can be resold, such as the boiler, the economizer, the fan, the burner, and the control panel, can be

[15] Exh. Z.

[16] The President of IPE testified that the highest value of some of this equipment was as scrap, which could be realized in Pratt without incurring the cost to return to Illinois.

9

separated from the ethanol plant and the items, such as piping, structural steel, and the stack, which are not worth returning to IPE.

When a user wants to lease equipment, IPE seeks to assure that the present value of the rental payments for the lease term are less than the fair market value of the leased equipment at the end of the lease term and buy out price is significantly higher than the removal cost, so the lessee can treat the monthly cost as an operating expense, rather than a capital expenditure. When estimating removal costs, IPE assumes that it will control the removal and utilize its experience of providing removal at the request of former customers. The President of IPE testified that she understood IPE had the right to control the removal of the TO/Boiler, as this was her understanding of the paragraphs of the Agreement quoted above.

Dougherty offered no testimony of the costs of removal *anticipated at the time of the Agreement*. Gateway's representative testified that he never considered the removal costs and was not involved in the negotiations of the terms of the Agreement. Ryan Hennes, called by Dougherty as an expert, testified and provided a written report that he estimated the cost to disassemble, remove, and ship the TO/Boiler and all of the external equipment as of February 19, 2009 was $602,500. There are two elements of this cost which the Court finds suspect. First, the estimate includes $161,000 for shipping costs, estimated using all truck transportation. The President of IPE testified that its boilers are always shipped by rail, that the ancillary equipment is shipped by truck, and that it had current bids for providing such transportation for a total cost of $40,000 to $50,000. Second, the estimate was based upon removing and shipping every piece of equipment supplied by IPE, including those that lacked resale value. No evidence of the portion of the estimated cost attributable to this factor was presented. IPE offered a firm bid from Fagan

for approximately $260,000 to disassemble and remove the TO/Boiler in 2009. The bid does not include transportation costs, which, according to IPE, would be $40,000 to $50,000.

There is agreement that the anticipated economic life of the TO/Boiler is 15 to 20 years. As to the value after five years, IPE's President testified that at the time of the Agreement she anticipated that the TO/Boiler would have a value of $600,000 after the five year term. Given IPE's prominence in the market for new and used boilers, the Court finds this testimony credible. Gateway's representative testified that he made no projection of the value of the Equipment at the end of five years. Dougherty's expert, retained for the purpose of trial, in his written report stated a tentative value of the used system, which the Court understands to be the projected value as of September 2011, based upon conditions in 2009, not in 2006, the date of the Agreement. Mr. Hennes' report states:

> The value of the Thermal Oxidizer/Boiler system after 5 years is difficult to gauge. After researching the prices of used boilers and discussing the value with Jeff Ehm of New Mech Companies, our opinion is that the system would be worth approximately $1,000,000. Before a final value of the system could be calculated, a thorough analysis of the system that provides the condition of the components would need to be provided.[17]

IPE's president testified that if the TO/Boiler were returned to IPE, she would market it as an ethanol boiler, if that market were viable. If that market were not viable, a present fact which she did not know at the time of the Agreement, she would convert the boiler package to a straight boiler, at a cost of approximately $900,000, and sell it for 1.4 to 1.9 million dollars. The

---

[17] Exh. FFF.

conversion cost estimate was based upon a recent conversation of a thermal oxidizer boiler undertaken for a customer.

The corporate representative of Gateway who testified at trial, a non lawyer, stated that Gateway always regarded the Agreement as a true lease. However, the attorney for Dougherty, who documented the loan transaction with Gateway, testified that he never was asked to render an opinion whether the transaction was a true lease and never considered that legal issue. There is no doubt that IPE intended a true lease.

**POSITIONS OF THE PARTIES.**

The parties agree that, in accord with the Agreement, Illinois law governs this Court's analysis. At the time of the Lease, Illinois had adopted the 1987 version of Uniform Commercial Code section 1-201(37) (hereafter UCC §1-201(37)), which addresses whether a transaction creates a lease or a security interest.[18] Dougherty contends that the Agreement is not a true lease under this section based upon two separate theories: First, that the transaction created a security interest under the bright line test of UCC §1-201(37) because Gateway had no right to terminate the Lease during the five year term and Gateway had an option to become the owner of the boiler system for nominal additional consideration. As an alternative, Dougherty asserts that even if it fails to satisfy the bright line test, the transaction created a security interest when all of the facts and circumstances are considered, as stated in UCC §1-201(37).

IPE responds that Dougherty should be estopped to claim the transaction created a security interest based upon representations made at the time of the transaction. As to

---

[18] 810 Ill. Comp. Stat. 5/1-201(37)(2001) (effective January 1, 2001 to December 31, 2008). The current version of the Illinois version of the UCC section distinguishing a lease from a security agreement is found at 810 Ill. Comp. Stat. 5/1-203 (2009).

12

Dougherty's contentions under UCC §1-201(37), IPE asserts that Dougherty has not satisfied its burden of proof that the transaction was other than a lease.

For the reasons stated below, the Court finds that Dougherty is not estopped to claim the transaction was other than a lease. As to Dougherty's claims under UCC §1-201(37), the Court finds that the bright line test of a security agreement is not satisfied and, when all of the facts and circumstances are considered, Dougherty has not proven that the Agreement is not a true lease.

## ANALYSIS AND CONCLUSIONS OF LAW.

### A. ESTOPPEL.

IPE asserts that Dougherty should be estopped from contending that the Agreement is not a true lease, as defined by Article 9 of the UCC, because it allegedly accepted benefit in the form of its closing and administrative fees in reliance upon the position that the transaction was a lease.[19] IPE relies upon two closely related estoppel theories: Quasi-estoppel and equitable estoppel. The traditional elements of the doctrine of equitable estoppel are: "(1) misrepresentation by the party against whom estoppel is asserted; (2) reasonable reliance on that misrepresentation by the party asserting estoppel; and (3) detriment to the party asserting estoppel."[20] The misrepresentation must be of fact; and one cannot be estopped by an erroneous opinion on a matter of law.[21] According to IPE, "quasi-estoppel applies when it would be

---

[19] IPE in its trial brief (Doc.307), makes additional estoppel arguments based upon Dougherty's and Debtor's representations during the § 363 sale process and in the Asset Purchase Agreement. The Court will not address these contentions since the issue before the Court is limited to whether the Agreement is a true lease or a disguised sale. IPE does not assert judicial estoppel.

[20] *Jersey State Bank v. Isringhausen (In re Isringhausen)*, 151 B.R. 203, 208 (Bankr. S.D. Ill. 1993), quoting *Kennedy v. United States*, 965 F.2d 413, 417 (7th Cir. 1982).

[21] *Id.*

13

unconscionable to allow a person to maintain a position that is inconsistent with one to which he or she acquiesced, or from which he or she accepted a benefit."[22]  Further, IPE asserts, that "[u]nlike equitable estoppel, 'quasi-estoppel does not require a detrimental reliance per se by anyone, but instead, quasi-estoppel is directly grounded upon a party's acquiescence or acceptance of a payment or benefits, by virtue of which that party is thereafter prevented from maintaining a position that is inconsistent with those acts.'"[23]  As the Kansas Supreme Court has said, "quasi-estoppel applies where party has previously taken position which is so inconsistent with position now taken as to render present claim unconscionable."[24]  The burden of proof is on the party claiming estoppel,[25] in this case, IPE.

The Court finds that IPE has not sustained that burden of proof.  As stated above, equitable estoppel does not apply to representations of law, and it is Dougherty's alleged change in the legal characterization of the Agreement which IPE seeks to preclude.  Even if the estoppel were not being raised to bar an alleged change in legal position, the Court would deny the defense because IPE has not shown the facts necessary for application of the doctrine.  The evidence is insufficient for the Court to conclude that Dougherty or Gateway represented that the Agreement was a true lease.  Dougherty's counsel rendered no such opinion.  Although the evidence does establish that Gateway and Dougherty understood the transaction to be a lease, rather than a sale,

---

[22] Doc. 307 at 5, citing 31 C.J.S. Estoppel & Waiver § 146 and *In re Kelly*, 216 B.R. 806 (Bankr. N. D.  Tenn. 1998).

[23] Doc. 307at 6, citing 31 C.J.S. Estoppel & Waiver § 146 and *In re Davidson*, 947 F.2d 1294 (5th Cir. 1991).

[24] *Wichita Fed. Sav. and Loan Ass'n v. Black*, 245 Kan. 523, 536, 781 P.2d 707, 716 (1989).

[25] *In re Isringhausen*, 151 B.R. at 208.

14

there is no evidence that anyone was using that term as a legal term of art. IPE has not established reliance on a representation made by either Gateway or Dougherty. There was no testimony addressing why a UCC-1 was not filed.

As to the doctrine of quasi estoppel, the Court finds that benefit did flow to Dougherty from the closing of the loan transaction, which was facilitated by changing the acquisition of the Equipment from a sale transaction to a lease. There was no evidence that this was the only solution to the problem posed in November 2005 which would have allowed the transaction to close. In other words, the evidence linking the benefit to Dougherty to the alleged representation that the Agreement was a true lease is tenuous. Dougherty's change in position, although bothersome to the Court, does not rise to the level of unconscionability. To apply quasi estoppel in these circumstances would be inconsistent with this Court's obligation under § 365 to examine the substance of the Agreement, rather than relying upon the form used by the parties.[26]

## B. THE UCC DEFINITION OF WHEN A TRANSACTION CREATES A LEASE.

### 1. BACKGROUND.

The Bankruptcy Code recognizes a distinction between true leases and security interests and treats them differently. However, it is state commercial law which controls the determination whether a contractual agreement is to be characterized as either a lease or security agreement.[27]

---

[26] *See Sillins v. Sillins (In re Sillins)*, 264 B.R. 894, 898 (Bankr. N.D. Ill. 2001) (finding quasi-estoppel inconsistent with court's duty to examine the substance of a property settlement agreement).

[27] *Banterra Bank v. Subway Equipment Leasing Corp. (In re Taylor)*, 209 B.R. 482 (Bankr. S.D. Ill 1997); *WorldCom, Inc. v. General Electric Global Asset Management Serv. (In re WorldCom, Inc.)*, 339 B.R. 56, 63 (Bankr. S.D. N.Y.2006); *see Duke Energy Royal, LLC v. Pillowtex Corp. (In re Pillowtex, Inc.)*, 349 F.3d 711, 716 (3rd Cir. 2003).

In this case, based upon the choice of law provision of the Agreement, the parties agree that it should be interpreted under Illinois law.

The parties also agree that because Dougherty is the party contending that the Agreement is not what it purports to be, Dougherty has the burden of proof to establish that its rights and obligations under the Agreement are not those of a lessee but those of a purchaser/owner of the TO/Boiler.[28] The Court finds it significant that the party challenging the characterization of the Lease was not involved in negotiating the terms of the Lease and is not a party to the Lease. Further, if successful, the recharacterization of the transaction as a secured sale would benefit only Dougherty, not the Debtor or any other creditors of the estate. Dougherty benefitted from the initial characterization of the transaction as a lease, and now completely changes its position apparently for its own financial gain. Indeed Dougherty's needs regarding the debt to equity ratio was the reason the transaction was changed to a lease, from the sale initially contemplated. Although the Court has declined to estop Dougherty from taking this position, the lack of equity in this reversal is readily apparent.

Under Illinois law, article 2A of the Uniform Commercial Code defines a lease as "a transfer of the right to possession and use of goods for a term in return for consideration, but a sale . . . or retention or creation of a security interest is not a lease."[29] The exclusion of a security interest from the definition of a lease requires the Court to focus on the definition of a security interest, which in 2006 was stated in section 1-201(37) of the Illinois Uniform Commercial Code (UCC 1-201), which was identical to the 1987 uniform version of the UCC. It states: "'Security

---

[28] *See In re Pillowtex, Inc.*, 349 F.3d at 716; *In re QDS Components, Inc.*, 292 B.R. 313, 321 (Bankr. S.D. Ohio 2002)

[29] 810 Ill. Comp. Stat. 5/2A-103 (2002).

16

interest' means an interest in personal property or fixtures which secures payment or performance of an obligation."[30]  It then provides that "[w]hether a transaction creates a lease or security interest is determined by the facts of each case."[31]  This statement is followed by a two part test. The first is the bright line test, which is discussed below.  However, courts and commentators agree, that even if the bright line test is not satisfied, the courts must apply a second test, examination of the specific facts of the case to determine whether the economics of the transaction support such a result.[32]

"The hallmark of a lease is that it grants the lessee the right to use property for a period less than its economic life with the concomitant obligation to return the property to the lessor while it retains some substantial economic life."[33]  In other words, "the lessor retains an economically meaningful residual interest in the leased property."[34]  The 1987 revision of the UCC eliminated reference to the intent of the parties to create a lease or security agreement, which had been in the prior version of the UCC and led to unfortunate results, and changed the focus to the economics of the transaction.[35]  It reasserted the "significance of residual value as the touchstone of the common law definition of a true lease."[36]  Nevertheless, the 1987 version of the

---

[30] 810 Ill.  Comp. Stat. 5/1-201(37) (2001).

[31] *Id.*

[32] *E.g., In re Pillowtex, Inc.*, 349 F.3d at 717; 4 White & Summers, Uniform Commercial Code § 30-3 (5th ed. 2002 & 2008 Supp.)(hereafter 4 Wright & Summers).

[33] *In re QDS Components, Inc.*, 292 B.R. at 322.

[34] *Id.*, 292 B.R. at 331.

[35] UCC §1-203, Official Comments ¶ 2 (2001).

[36] I*n re QDS Components, Inc.*, 292 B.R. at 331.

UCC has not been a panacea, and courts, including this Court, continue to wrestle with the distinction.

## 2. THE BRIGHT LINE TEST.

The bright line test for whether a transaction in the form of a lease creates a security interest is stated in the first part of 1-201(37). It provides:

> . . . a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee; and . . .
> a) the original term of the lease is equal to or greater than the remaining economic life of the goods;
> (b) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;
> (c) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement; or
> d) the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

The first part of the test looks at whether the lessee may terminate the agreement during its term. The second part looks at what are referred to as the Residual Value Factors. If the lessee may not terminate the lease during its term and any one of the Residual Value Factors is present, the transaction is a sale without consideration of any other facts and circumstances.

Dougherty contends that it has sustained its burden to prove the bright line test satisfied. The first element is present. The parties agree that Gateway did not have an explicit right to terminate the Agreement during its five year term.[37] Dougherty asserts in addition that Residual

---

[37] As to IPE, see Doc. 307.

Value Factor four - that Gateway had the "option to become the owner of the goods [the TO/Boiler] for no additional consideration or nominal additional consideration upon completion with the lease agreement"[38] - is also present.

Subsection 1-203(37) defines when additional consideration is nominal,[39] stating in part: "Additional consideration is nominal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised." Commentators have opined that "nominality is merely a proxy for the questions: 'Is the option price so low that the lessee will certainly exercise it and will, in all plausible circumstances, leave no meaningful reversion for the lessor?'"[40] Establishing nominality where there is a purchase option price and cost associated with performance if the option is not exercised requires a comparison of the option purchase price with the reasonably predictable costs of performance under the lease if the purchase option is not exercised.[41]

The nominality determination must be made as of the time of the agreement based upon the expectations of the parties when entering into the transaction. Subsection(y) of 1-201(37)

_____

[38] UCC 1-201(37)(1)(d).

[39] (x) Additional consideration is not nominal if (i) when the option to renew the lease is granted to the lessee the rent is stated to be the fair market rent for the use of the goods for the term of the renewal determined at the time the option is to be performed, or (ii) when the option to become the owner of the goods is granted to the lessee the price is stated to be the fair market value of the goods determined at the time the option is to be performed. Additional consideration is nominal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised;

(y) "Reasonably predictable" and "remaining economic life of the goods" are to be determined with reference to the facts and circumstances at the time the transaction is entered into; . . . .

[40] 4 White & Summers., at § 30-3(e).

[41] *See In re QDS Components, Inc.*, 292 B.R. at 335.

19

provides that "reasonably predictable" is to be "determined with reference to the facts and circumstances at the time the transaction is entered into."  Commentators state:

> First, nominality is tested at the time the agreement is signed.  As we have indicated, that is explicit in . . . 1-201(37); something is a security agreement or lease when it is signed.  Nominality, therefore, must be determined by considering the parties' prediction of concluding value at signing, not by considering the actual value at the conclusion of the term . . .. [42]

"When the parties sign the contract and become bound, they have either made a lease or a security agreement."[43] "[P]resent judgments about values, useful life, inflation, risk of non-payment, and other matters"[44] are reflected in the agreement.  Although the agreement may at the end favor one party over the other, that does not change the character of the transaction.  "Foresight not hindsight controls."[45]

Courts agree that nominality must be based upon the expectations at the time of signing and have held the security agreement proponent failed to satisfy its burden of proof when not presenting evidence of parties' expectations of the factors relevant to nominality.  For example, in *WorldCom*, the Bankruptcy Court for the Southern District of New York, stated, "Thus, in analyzing nominality, the 'reasonably predictable' cost of performance is the cost of performance

---

[42] 4 White & Summers, at § 30-3(e).

[43] *Id.* at § 30-3(c)(3).

[44] *Id.*

[45] *Id.*; *see Matter of Marhoefer Packing Co., Inc.*, 674 F.2d 1139, 1144-45 (7th Cir. 1982) (holding under Illinois law that in determining whether an option price is nominal, the proper figure to compare it with is not the actual fair market value of the leased goods at the time the option arises, but the value anticipated at the time the lease was signed.  If because of inflation or other matters the lessee's option becomes more favorable than either party anticipated at the time of singing, this does not change the true character of the transaction.).

20

as anticipated by the parties at the time the Agreement was signed."[46] and held Worldcom had not sustained its burden of proof as to nominality because it did not seriously attempt to assert that its evidence reflected the parties' expectations at the time the Agreement was signed.[47] In *QDS Components*, because the record contained no evidence establishing what the original parties to the transaction anticipated at contract inception concerning QDS's cost of performing under the lease, including the cost of returning the goods to the lessor, the court held that the party objecting to characterization of the transaction as a true lease had failed to demonstrate the nominality of the option amount under the bright line test.[48]

As stated above, under the Agreement Gateway has the option at the end of the five year lease to either return the Equipment to IPE, with Gateway paying the cost of removal and shipment, or to retain the Equipment upon payment of the Fixed Option Price of $600,000. When arguing that price to retain the TO/Boiler is nominal, Dougherty contends the cost of performance equals or exceeds the Fixed Option Price based upon consideration of four factors: The cost of removal; the fact that the Fixed Option Price is only 12% of the Replacement Value of $5,041,970 stated in the Lease; the cost to replace the TO/Boiler, which is necessary for operation of the ethanol plant; and the equity in the TO/Boiler which would have been built up if Gateway had fully performed the Lease.

The Court agrees with Dougherty that the cost to remove and return the Equipment to IPE is relevant to the nominality determination. However, as discussed above, the relevant cost for

---

[46] *In re WorldCom*, 339 B.R. at 68.

[47] *Id.*, 339 B.R. at 69.

[48] *In re QDS Components*, 292 B.R. at 337-338.

application of the bright line test is that anticipated in September 2006, when the Agreement was executed. Dougherty has provided no evidence that the anticipated cost approached $600,000. Although Dougherty's expert, Mr. Hennes testified that it would cost $602,500 to remove the TO/Boiler and related equipment and ship it to IPE in Illinois, this is his estimated cost for removal and shipment in 2009. Mr. Hennes was not involved in arranging the transaction and could not testify as to the cost of return anticipated by the parties in 2006. Mr. Barker, a Dougherty witness who was designated as the representative of Gateway for purposes of the trial, stated that in 2005 and 2006 he made no projections of the costs of removal after expiration of the Agreement.

Ms. Forsythe-Fournier, the President of IPE who determined the economic terms of the Agreement offered and accepted by Gateway, was called as a witness on behalf of Dougherty. She testified that at the time the Agreement was signed she estimated that the cost to remove and return the TO/Boiler was approximately $200,000, based upon IPE's experience in removing two multi-boiler systems in 2002 or 2003. Further examination revealed that this estimate might have been some what low, and an estimate of up to $250,000 might have been more accurate. Her testimony is the only evidence in the record as to the anticipated cost of removal and shipment of the TO/Boiler at the time of Agreement. That cost, $200,000 to $250,000, was significantly less than the Purchase Option Price of $600,000.[49]

The Court finds, contrary to the position of Dougherty, that the fact that the Agreement provides the Fixed Option Price ($600,000) is approximately 12% of the Replacement Value

---

[49] The Court surmises that this estimate did not include removal and return of the portion of the Equipment whose highest value was as scrap.

($5,041,970) does not establish nominality. First, the 1987 version of the UCC "disavows percentage tests."[50] Second, the option price should not be compared with the Replacement Cost, which includes not only the value of the Equipment at the time of the Agreement but also the costs to develop, ship, and install the entire system. Rather, nominality of the option price amount is determined by comparison of the option amount with the expected value of the TO/Boiler at the time the option is to be exercised,[51] in this case five years after September 2006. Mr. Hennes, Dougherty's expert, stated in his report that in his opinion the value of the TO/Boiler after 5 years would be approximately $1,000,000. But this value is his tentative opinion formed in 2009 and was not the value anticipated by the parties in 2006. Further, this value is not final, as Mr. Hennes wanted to do more research before opining as to the value after 5 years.

IPE, on the other hand, did provide evidence of the anticipated value of the TO/Boiler at the end of the term. Ms. Forsythe-Fournier, President of IPE, which has the largest stock of new and used boilers in the world, testified that when she determined the terms of the Agreement she anticipated that after five years the value would be $600,000. There is no evidence contradicting this estimate. In addition, Ms. Forsythe-Fournier testified that if the boiler is returned in 2009, when there is no market for ethanol boilers, and converted to a straight boiler, with a conversion cost of $900,000, she would expect a sale price of 1.4 to 1.9 million dollars. Accordingly, from the record the Court can not conclude, as urged by Dougherty, that the Fixed Option Price is

---

[50] 4 White & Summers,  at §30-3(b)(1).

[51] Id., at §30-3(e).

23

nominal when compared with the value after five years as anticipated at the time of the Agreement.[52]

The cost to replace the TO/Boiler if it is returned after five years is not a consideration when determining nominality. It is not a "reasonably predictable cost of performing under the lease agreement," as required by the UCC definition of nominality.[53] The cost to replace the TO/Boiler is a cost to return the ethanol plant to operational status if the TO/Boiler is returned, not a cost to perform the Agreement. This case is therefore clearly distinguished from *Pillowtex*,[54] relied upon by Dougherty. In *Pillowtex,* Duke agreed to install certain energy saving equipment, and Pillowtex agreed to make payment over eight years. At the end of the term, Duke had four options, one of which was to remove the installed equipment and replace it with equipment similar to that originally in place. Because of this option, the cost of replacement was relevant when examining, for purposes of the facts and circumstances test, whether Duke anticipated residual value in the equipment at the end of the term.[55] In this case, the Agreement is silent as to replacement costs if the boiler is removed. Further, as noted by the court in *QDS Components*, the inclusion of replacement cost would have the "effect of converting 'the most obvious true lease [into] a security agreement.'"[56] Interpreting the "phrase 'cost of performing under the lease

---

[52] White & Summers opines that any option price above 50% of the predicted fair market value should be accepted as not nominal. 4 Wright & Summers, at §30-3(e). Even if the Court accepted Dougherty's expert's opinion that the value of the TO/Boiler afer five years would be $1,000,000, the option price would not be nominal under this test.

[53] 810 Ill. Comp. Stat. 5/1-201(37)(x)(2001).

[54] *In re Pillowtex*, 349 F.3d at 711.

[55] *Id*, 349 F.3d at 714, 720.

[56] *In re QDS Components*, *Inc.*, 292 B.R. at 338, n.15.

24

agreement if the purchase option is not exercised' broadly so as to include the economic value a lessee chooses to forego when it declines to exercise a purchase option would produce absurd results."[57]  *In Pillowtex*, the question of consideration of the cost to replace the installed equipment arose under the facts and circumstances test, not the bright line test.

Likewise the Court declines to find that the equity which Dougherty alleges Gateway would have built up in the TO/Boiler at the end of the lease term relevant to the bright line nominality test.[58]  Under the UCC 1-201, the question is whether the lessee "has an option to become the owner of the goods for no consideration or nominal consideration."  A  lessee's alleged equity, like replacement cost of the equipment if returned, simply is not a cost of performance under the Agreement.  The test is what the lessee would be required to expend to retain the leased goods, not what it would give up if it were returned.

For the foregoing reasons, the Court holds that Dougherty has failed to establish that the Lease is a disguised sale based upon the bright line test of UCC 1-201(37).  Dougherty has not sustained its burden of proof that the anticipated cost to Gateway to exercise its option to purchase the TO/Boiler at the end of five years was nominal, as that term is defined in the controlling statute.

### 3.  ALL THE FACTS AND CIRCUMSTANCES TEST.

When the bright line test is not satisfied, UCC §1-201(37) requires the court to consider "the facts of each case."  This consideration is guided by the fact that the drafters of amended UCC §1-201(37) sought to "preserve common law principles," under which the "central feature

---

[57] *Id.*

[58] The argument is relevant to the facts and circumstances test and is discussed below.

of a true lease is the reservation of an economically meaningful interest to the lessor at the end of the lease term."[59]  The Official UCC Comments states: "If a transaction creates a lease and not security interest, the lessee's interest in the goods is limited to its leasehold estate; the residual interest in the goods belongs to the lessor."[60]  When the bright line test is not satisfied, the court must then answer the question whether the lessor retained a reversionary interest, either an upside or downside risk.[61]  "To have a true lease, the original agreement must leave the lessor with some meaningful economic interest in the residual."[62]  The challenge to the courts "therefore is first to establish the indicia that evidence a reversionary interest in the leased goods and then determine whether those indicia are apparent in the case at hand."[63]

The UCC does not provide an explicit test for reservation of a meaningful reversionary interest.  The UCC only states that "a transaction in the form of a lease does not create a security interest merely because" one of the following is true:

> (a) the present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into;
> (b) the lessee assumes risk of loss of the goods, or agrees to pay taxes, insurance, filing, recording, or registration fees, or service or maintenance costs with respect to the goods;

---

[59] Edwin E.  Huddleson, Old Wine in New Bottles: UCC Article 2A-Leases, 39 Ala L. Rev.  615, 625 (1988).

[60] UCC §1-203, Official Comment ¶ 2 (2001).

[61] 4 White & Summers, at § 30-3(d); *In re WorldCom, Inc.*, 339 B.R. at 71 (concluding the "majority of courts and commentators have agreed that the principle inquiry [of the facts of each case] is 'whether the lessor has retained a *meaningful reversionary interest* in the goods.").

[62] Huddleson, Old Wine in New Bottles, 39 Ala. L. Rev. at 631.

[63] *In re WorldCom, Inc.*, 330 B.R. at 72.

> (c) the lessee has an option to renew the lease or to become the
> owner of the goods;
> (d) the lessee has an option to renew the lease for a fixed rent that is
> equal to or greater than the reasonably predictable fair market rent
> for the use of the goods for the term of the renewal at the time the
> option is to be performed; or
> (e) the lessee has an option to become the owner of the goods for a
> fixed price that is equal to or greater than the reasonably predictable
> fair market value of the goods at the time the option is to be
> performed.

Commentators opine that the drafters intended by including this list to overrule a series of bad decisions under the pre-1987 version of UCC §1-201(37)[64] and that generally, with the possible exception of element (a) that the factors are not only "not enough" to indicate a sale, but are "generally irrelevant."[65]

Court decisions likewise have not adopted a consistent set of factors for identifying a lessor's residual interest. As one court has stated, "Indeed, there seem to be nearly as many different approaches to determining the existence of a meaningful residual interest as there are reported decisions."[66] The Agreement states that it shall be controlled by Illinois law, but the Court has been unable to find cases from Illinois which are helpful here. *Marhoefer Packing*[67] appears to be a leading case, but it was decided in 1982, before Illinois' adoption of the 1987 version of the UCC. Another frequently cited case is *In re Taylor*.[68] It lists the following factors as relevant: "(1) whether the lessee has the option to renew the lease or to become the owner of

---

[64] 4 White & Summers, at §30-3(c)(2).

[65] *Id.*

[66] *In re QDS Components, Inc.*, 292 B.R. at 342.

[67] *In re Marhoefer Packing Co., Inc.*, 674 F.2d at 1139 (applying Illinois law).

[68] *In re Taylor*, 209 B.R. at 482.

27

the property; (2) whether the amount of rent exceeds the fair market value of the property; (3) whether the debtor is responsible for the payment of taxes, insurance and other costs incident to ownership; and (4) whether the useful life of the property exceeds the length of the term of the lease."[69] The first three of these considerations are included in the statutory list of factors which standing alone do not indicate a transaction has created a security, and are therefore at most of marginal importance. Further, *Taylor* relies upon *Marhoefer Packing*,[70] decided under prior law. *Buehne Farms, Inc.*,[71] decided in 2005, found a disguised sale rather than a lease under the bright line test, so does not provide guidance to the Court when evaluating all of the facts and circumstances.

Rather than applying a laundry list of factors identified by other courts, the Court will focus upon the economic factors of the Agreement and evaluate whether they evidence IPE retained a residual interest in the TO/Boiler. The Court, finds the Agreement to be a true lease based upon consideration of: (1) The anticipated useful life of the TO/Boiler; (2) IPE's ability to market the TO/Boiler at the end of the lease term; (3) the amount of the lease payments in relation to the value of the TO/Boiler; (4) whether the TO/Boiler is unique because it was designed for installation in the Gateway plant; (5) whether at the time of the Agreement, the long term operation of the ethanol plan required Gateway's continued possession of the TO/Boiler; and (6) the economic benefit to Gateway and Dougherty from the transaction being structured as a lease rather than a sale.

---

[69] *Id.*, 209 B.R. at 487.

[70] *In re Marhoefer Packing Co., Inc.*, 674 F.2d at 1139, cited in *In re Taylor*, 209 B. R. at 487 and 488.

[71] *In re Buehne Farms, Inc.*, 321 B.R. 239 (Bankr. S.D. Ill. 2005).

First, the evidence is unrefuted that the expected useful life of the TO/Boiler is 15 to 20 years.[72]  The Agreement is a five year contract.

Second, the Court finds that the TO/Boiler will have value to IPE if returned at the expiration of the five year lease.  Such value was anticipated when the Agreement was executed in 2006 and exists today.  IPE is a worldwide leader in the sale and leasing of boilers, both new and used.  It has supplied boilers to ethanol plants, a growing business in 2006.  Although the ethanol industry has hit hard times, the TO/Boiler has marketability for other uses.  IPE could, for a cost of approximately $900,000, convert the TO/ Boiler to a steam boiler, after which it could be sold for 1.4 to 1.6 million dollars.

Third, the payment terms do not evidence a sale.  Under the Agreement, Gateway, if it had made all of the lease payments for 60 months, discounted at the rate of 7.754%, would not have paid the full Replacement Price, or purchase price.  The record includes calculations showing that, using an interest or discount rate of 7.754%, if the transaction had been structured as a financed sale, after five years, approximately $600,000 of the $5,041,970 purchase would not have been paid.[73]  There was no testimony challenging this discount rate.  Thus, if the transaction were considered a sale, and the monthly lease payments were considered payments of principle and interest, the non-bargain purchase price of $600,000 would have been approximately equal to the remaining loan balance.  Further, even if the Agreement provided for the full price to be paid during the lease term, this would not conclusively establish a sale.  UCC §1-201(37) expressly states: "A transaction [in the form of a lease] does not create a security interest merely because it

---

[72] Some equipment external to the TO/Boiler had a shorter expected life, but this fact did not play a role in the parties' arguments.

[73] Exh. Z.

29

provides that: (1) the present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into." The official comments interpret this provision as stating that "a full payout lease does not *per se* create a security agreement."[74] Commentators find this provision "puzzling," stating that "[n]ormally one would assume that when that test is met the parties have a secured sale, not a lease."[75] They explain the provision as follows:

> Could tax and other benefits to the lessee change the equation? To see how that might be so, consider *Rushton v. Shea*, cited in the comment to section 1-201(37), in which one party leased railroad tank cars. Over the 15-year lease, the lessor would have received payments with a present value equal to the fair market value of the tank cars plus approximately 1% per month interest. This would seem to indicate that the transaction was a secured sale. But because the tank cars were expected to retain significant residual value which would revert to the lessor at the end of the 15-year lease, the court found the transaction to be a true lease.
>
> The question remains, why would a lessee enter into such a transaction? There are several possibilities. First, the lessor and lessee might be controlled by the same party and the lease might be a device for shifting income from one to the other. Second, there may be unique tax benefits to be gained by the lessee . . .. Of course, the lessee might be making payments to the lessor to enjoy certain other benefits of the lease such as the avoidance of debt limitations in other loan documents or the avoidance of state and local personal property taxes. . . .. The end result is that the lessee realizes a valuable benefit which, when offset against the payments to the lessor, means the net amount the lessee is paying to the lessor is not equal to or greater than the fair market value of the goods.[76]

---

[74] UCC §1-203, Official Comment ¶2 (2001).

[75] 4 Wright & Summers, at § 30-3(c)(2).

[76] *Id.*

Case 08-22579    Doc# 407    Filed 06/05/09    Page 30 of 37

In this case, not only were the total payments, when discounted, less than the value of the Equipment, but, a lease rather than a sale had other benefits. As examined below, Gateway and Dougherty received an economic benefit from the lease form, and lease of the TO/Boiler facilitated the future change to a gas fired system to be developed by Indeck Energy. In addition, after five years the TO/Boiler retained significant value, which reverted to IPE. The payment terms are not sufficient to establish a sale transaction.

Fourth, Gateway and Dougherty benefitted economically from the transaction being handled as a lease rather than a sale. Initially, Lurgi planned to purchase the boiler needed for the ethanol plant and to include the purchase cost in the construction budget. In November 2005, a status meeting was held involving Lurgi, Gateway, and those providing capital and financing for the project, including Dougherty and Indeck Energy. One of the problems to be addressed was the short fall of equity investment if the 45/55 ratio of equity to debt was to be maintained, as thought necessary by Dougherty to obtain third party purchasers for the loans to Gateway to be furnished through Dougherty. At the meeting it was proposed that this problem could be solved in part if Gateway were to lease the boiler, rather than it being purchased by Lurgi. The proposal was approved, and on December 15, 2005, the initial lease with IPE for the TO/Boiler was executed. The Offering Memorandum prepared by Dougherty for consideration by those interested in participating in the $53 million loan to Gateway includes a pro forma income statement showing annual lease expense in the amount of the December 15, 2005 lease with IPE. As a result of leasing rather than purchasing the IO Boiler, Gateway reduced the amount of capital/loan required and facilitated Dougherty's marketing of participations based upon projected 45/55 equity to debt ratio without the need to raise additional capital. Dougherty had to believe that the transaction had

31

the financial characteristics of a true lease in order to market loan participations to the banks, because to believe otherwise would have meant that Dougherty knew the 45/55 equity to debt ratio was not true.

Fifth, although the TO/Boiler was designed for installation in the Gateway plant, there was no evidence that the principle components are unique. Other ethanol plants use similar boilers. IPE designs its systems in modules which facilitates adaptation to various uses. As stated above, if the TO/Boiler is returned to IPE, it can be marketed for use in an ethanol facility or, after modification, for a different installation.

Sixth, the Gateway plant was designed to facilitate the removal of the gas fired TO/Boiler and replacement with a coal-fired boiler. Before the acquisition of a boiler was changed from a sale to a lease, consideration had been given to the use of coal rather than gas to fire the boiler at the plant, since at that time gas was considerably more expensive than coal. Indeck Energy Services had negotiated an Energy Services Agreement with Gateway whereby Energy would permit, build, and operate a coal-fired plant and Gateway would agree to purchase steam from that plant. When it was decided that coal was not feasible initially because permitting and installation of a coal plant would delay the project, it was decided that a gas fired plant would be installed, but care was taken to assure that the design of the ethanol plant was compatible with replacing the boiler. Therefore, the Court finds that Gateway had a interest in not purchasing a gas fired system because of the possibility of replacement of the TO/Boiler before the expiration of its expected useful life.

The role of intent when distinguishing between a lease and a security agreement under all the facts and circumstances test of the 1987 version of the UCC is not certain. It seems clear that

32

the drafters intended economic factors to predominate, but it is not clear that they intended intent of the parties to be irrelevant. In this case, it is uncontroverted that at the time of the Lease, IPE, Gateway, and Dougherty intended the transaction to be a lease. In addition to the facts stated in the above paragraph regarding the November 2005 meeting, those involved in the transaction uniformly testified that a lease was intended. The representative of Gateway testified that at the closing of the financing provided by Dougherty, the transaction was identified as a lease, and he first learned that this status was being challenged in mid December 2008, after the Gateway bankruptcy had been filed. Counsel for Dougherty who documented the Gateway financing testified that it was no secret that the TO/Boiler was to be leased. The President of IPE certainly intended the transaction to be a true lease.

Based upon the foregoing, the Court concludes that IPE preserved a meaningful reversionary interest in the TO/Boiler. As discussed below, the Court has considered the numerous facts which Dougherty contends exhibit that the transaction is not a true lease and rejects them as being insufficient to sustain its burden of proof.

First, Dougherty contends a sale occurred because IPE calculated payment terms by amortizing the replacement value. IPE did use an amortization computer program which computed the effect of the monthly lease payments if the purchase had been a financed sale with an interest rate of 7.754 %. However, these calculations do not evidence that the transaction was a sale. There is no evidence that the schedules were supplied to Gateway as a part of the transaction. They became known to Dougherty only through discovery in this case. The President of IPE testified that the documents were created by IPE's bookkeeping department to assist with booking of the transaction after the Agreement was entered into. Moreover, as discussed above, although

33

the total amount of the payments in relation to the value of the Equipment at the time of the agreement approached "full pay out lease," under the facts of this case the payments do not indicate a sale. The TO/Boiler has residual value after five years. Gateway benefitted from the lease economically through shifting the cost of the boiler out of the construction costs to operating costs and facilitating the contemplated change to the gas fired system being developed by Indeck Energy.

Second, the facts that Gateway was obligated to insure the equipment for its full replacement value, to maintain the equipment, and to assume risk of loss do not in the Court's view strongly support Dougherty's position. The 1987 version of UCC 1-201(37) provides that these conditions standing alone do not evidence a sale.[77] Generally, such provisions are compatible with either a lease or a sale. Under Article 2A of the UCC, section 2A-218, the parties to a lease may by their agreement determine that one or more parties have an obligation to insure the goods and to determine the beneficiary of the proceeds of insurance. Although Article 2A, in section 2A-219 provides that risk of loss does not pass to a lessee, except in a finance lease, UCC section 1-302 provides that the effect of the UCC may be varied by agreement.

Third, the Court rejects Dougherty's argument that a disguised sale is present because the TO/Boiler was specially designed for the Gateway ethanol plant. Although custom designed equipment may be indicative of a sale,[78] in this case the evidence convinces the Court that the

---

[77] The cases that Dougherty relies upon were for the most part decided under prior law, when intent rather than economic reality was the focus. *See In re Loop Hosp. P'ship*, 35 B.R. 929 (Bankr. N.D. Ill. 1983); *Orix Credit Alliance, Inc. v. Pappas*, 946 F.2d 1258 (7th Cir. 1991); *Mid-America Packing Specialists Division v. General Motors Acceptance Corp. (In re Tulsa Port Warehouse Co., Inc.)*, 690 F.2d 809 (10th Cir. 1982).

[78] *See In re The Answer - the Elegant Large Size Discounter, Inc.*, 115 B.R. 465, 469 (Bankr. S.D. N.Y. 1990)(one factor in finding a sale instead of a lease was that fixtures were custom designed and there

common features of the TO/Boiler predominate over those which are unique to the Lurgi installation. The testimony of the President of IPE establishes that the equipment after removal would be useful in other situations.

Fourth, although the fact that the warranties are those which IPE customarily provides with a sale would normally indicate a sale transaction, that indication is not true in this case. The sale warranties were included at the special request of Gateway, who concurrently requested that the transaction be in the form of a lease. The disclaimer of warranties of merchantability and fitness for a particular purpose are permitted in both sales and leases.[79]

Fifth, Dougherty's next argument is that the impracticality of relocating the Equipment evidences a sale. This argument has superficial appeal. The TO/Boiler is a piece of equipment necessary to the operation of the ethanol plant, removal would interrupt operations, and the cost of removal is not insignificant. However there is testimony which convinces the Court not to weigh this fact very heavily. IPE specifically designs its boilers in modules so that they are removable. At the time of the Lease, Gateway was a party to the Energy Services Agreement, under which Indeck Energy would permit, build, and operate a coal-fired boiler to replace the gas fired system. Since, this change would have required the removal of the leased system, Gateway at the time of the Agreement must have regarded the impracticality of relocating the Equipment as insignificant.

Sixth, it is uncontroverted that Gateway was responsible for sales taxes and for securing licenses and permits. In Kansas a sales tax is charged on leased as well as purchased equipment,

---

was no evidence that they had value to other potential users).

[79] UCC §2-316 (sales); UCC §2A-214 (leases).

so the possibility of a sales tax being collected is not indicative of the nature of the transaction.[80] Further, there is evidence that the Equipment was exempt from taxation, so the allocation of liability had no financial impact. As to the licenses and permits which must be secured by Gateway, there was no evidence as to what licenses or permits were involved and no argument as to how they indicate the presence of a sale. Dougherty fails to explain how Gateway's responsibility for licenses or permits impacts the characterization of the transaction.

For the foregoing reasons, when all of the circumstances of the Agreement are considered, the Court holds that Dougherty has not sustained its burden of proof to establish that Agreement is other than a lease. The economic terms of the Agreement were such that IPE retained a meaningful residual interest in the TO/Boiler at the end of the five year term of the Agreement.

**CONCLUSION.**

The Court finds that the September 2006 lease between IPE and Gateway was a true lease under Illinois law. Accordingly, it is subject to assumption or rejection under § 365 of the Code. The additional issues raised in the Objection of Indeck Power Equipment Company to the Cure Amount and Statement of Cure Claim under Debtor's Notice of Intent to Assume and Assign Certain Executory Contracts and Unexpired Leases in Conjunction with the Sale of Assets[81] remain to be determined by agreement of the parties or in subsequent proceedings.

The foregoing constitute Findings of Fact and Conclusions of Law under Rules 7052 and 9014(c) of the Federal Rules of Bankruptcy Procedure which make Rule 52(a) of the Federal Rules of Civil Procedure applicable to this matter.

---

[80] *See* K.S.A. 79-3603(a) and (h).

[81] Doc. 194.

**IT IS SO ORDERED.**

### ###

Case 08-22579    Doc# 407    Filed 06/05/09    Page 37 of 37